| | | |
|---|---|---|
| Cargo Insurance | 42 ~~Any additional premium which might be placed on the cargo insurance by reason of the Vessel's age and/or condition shall be for Owners' account, and Charterers shall be entitled to deduct the cost of any such additional premium from the freight.~~ | 521<br>522<br>523 |

| | | |
|---|---|---|
| Bunker Fuel | 43. ~~If the supply of bunker fuel required for the voyage performed under this Charter should not at the material date be covered under a contract between Owners and any of the BP Group of Companies, the first option of supplying such bunker fuel shall be given by Owners to a Company within the BP Group.~~ | 524<br>525<br>526 |

If the vessel requires supply of bunkers for the voyage performed under this charter party the first and last option for supplying such bunkers to be given by Owners to Charterers or to their nominated company. Quality and cost always to be acceptable to Owners.

| | | |
|---|---|---|
| Traffic aration and Routeing | 44. Owners shall instruct the Master to observe recommendations as to traffic separation and routeing as issued from time to time by the International Maritime Organisation or as promulgated by the State of the flag of the Vessel or the State in which the effective management of the Vessel is exercised. | 527<br>528<br>529 |

| | | |
|---|---|---|
| Oil Pollution Prevention | 45. Owners shall instruct the Master to retain on board all oily residues of oil of a persistent nature remaining in the Vessel from the previous cargo. The Master shall, during tank washing, collect the washings into one cargo compartment and after maximum separation of the free water, discharge the water so separated overboard. In the discharge of all water separated as aforesaid Owners shall comply with the requirements of the International Convention for the Prevention of Pollution from Ships 1973, as amended by its Protocol of 1978 (MARPOL 73/78), insofar as these do not conflict with any applicable law. | 530<br>531<br>532<br>533<br>534<br>535 |
| | When this operation is completed the Master shall notify Charterers by radio of the estimated tonnage of all segregated tank washings from previous cargoes. | 536<br>537 |
| Treatment of Tank Washings | On the Vessel's arrival at the loading port or place the Master shall arrange that the quantity of all segregated tank washings shall be measured in conjunction with cargo suppliers and shall make a note in the Vessel's ullage record of the quantity so measured. | 538<br>539<br>540 |
| | ~~If Charterers require the Master to load the cargo on top of the segregated tank washings, freight calculated in accordance with Clause 6 shall be paid on that quantity of the tank washings up to a tonnage equivalent of 1% of the Vessel's summer deadweight. Owners shall instruct the Master to keep the water to a minimum and in any event not exceeding 0.15% of the Vessel's summer deadweight tonnage.~~ | 541<br>542<br>543<br>544 |
| | ~~If Charterers require the Master to segregate the tank washings from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.~~ | 545<br>546 |
| | ~~If, for whatever reason, the cargo loaded hereunder is not loaded on top of the segregated tank washings from previous cargoes (or any part thereof), Owners undertake that all such washings shall be discharged or disposed of or retained in accordance with the orders and directions of Charterers on completion of the voyage hereunder.~~ | 547<br>548<br>549<br>550 |
| Exceptions | 46. The provisions of Articles III (other than Rule 8), IV, IV bis and VIII of the Schedule to the Carriage of Goods by Sea Act, 1971 of the United Kingdom shall apply to this Charter and shall be deemed to be inserted in extenso herein. This Charter shall be deemed to be a contract for the carriage of goods by sea to which the said Articles apply, and Owners shall be entitled to the protection of the said Articles in respect | 551<br>552<br>553<br>554 |

of any claim made hereunder. 555

Charterers shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or 556
damage or delay or failure in performance hereunder arising or resulting from Act of God, act of war. 557
seizure under legal process, quarantine restrictions, labour disputes, strikes, riots, civil commotions. arrest 558
or restraint of princes, rulers or peoples. 559

**War Risks** 47. (a) The Master shall not be required or bound to sign Bills of Lading for any blockaded port or for 560
any port which the Master or Owners in his or their discretion consider dangerous or impossible to enter 561
or reach.— 562

563
(b) If— 564
(i) any port of loading or of discharge named in this Charter or to which the Vessel may properly be 565
ordered pursuant to the terms of this Charter or the Bills of Lading be blockaded; or

(ii) owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions, or the 566
operation of international law;— 567

(aa) entry to any such port of loading or of discharge or the loading or discharge of cargo at any port 568
be considered by the Master or Owners in his or their discretion dangerous or prohibited, or 569

(bb) it be considered by the Master or Owners in his or their discretion dangerous or impossible for 570
the Vessel to reach any such port of loading or of discharge, 571

then Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or 572
discharged at any other port of loading or of discharge whether within or outside the range of loading or 573
discharge ports respectively established under the provisions of this Charter (provided such other port is 574
not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Own- 575
ers' discretion dangerous or prohibited). If no orders be received from Charterers within 48 hours after 576
they or their agents have received from Owners a request for the nomination of a substitute port, then: 577

if the affected port is the first and only loading port and no cargo has been loaded, this Charter 578
shall terminate forthwith; 579

if the affected port is a loading port and part of the cargo has already been loaded, the Vessel 580
may proceed on passage and Charterers shall pay for any deadfreight so incurred; 581

if the affected port is a discharge port, Owners shall be at liberty to discharge the cargo at any safe 582
port which they or the Master may in his or their discretion decide on (whether within or outside the 583
range of discharge ports established under the provisions of this Charter) and such discharge 584
shall be deemed to be due fulfilment of the contract or contracts of affreightment so far as cargo so 585
discharged is concerned. 586

In the event of the cargo being loaded or discharged at any such other port within the respective range of 587
loading or discharge ports established under the provisions of this Charter, this Charter shall be read in re- 588
spect of freight and all other conditions whatsoever as if the voyage performed were that originally 589
designated. However if the Vessel discharges the cargo at a port outside the range of discharge ports estab- 590
lished under the provisions of this Charter, freight shall be paid as for the voyage originally designated and 591

~~all extra expenses involved in reaching the actual port of discharge and/or discharging the cargo thereat~~ 592
~~shall be paid by Charterers. In the latter event Owners shall have a lien on the cargo for all such extra~~ 593
~~expenses.~~ 594

~~(e) The Vessel shall have liberty to comply with any directions or recommendations as to departure,~~ 595
~~arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatso-~~ 596
~~ever given by the government of the nation under whose flag the Vessel sails or any other government or~~ 597
~~local authority including any de facto government or local authority or by any person or body acting or~~ 598
~~purporting to act as or with the authority of any such government or authority or by any committee or~~ 599
~~person having under the terms of the war risks insurance on the Vessel the right to give any such directions~~ 600
~~or recommendations. If by reason of or in compliance with any such directions or recommendations~~ 601
~~anything is done or is not done such shall not be deemed a deviation.~~ 602

~~If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to~~ 603
~~the port or ports of discharge originally designated or to which she may have been ordered pursuant to the~~ 604
~~terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or~~ 605
~~Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be~~ 606
~~deemed to be due fulfilment of the contract or contracts of affreightment and Owners shall be entitled to~~ 607
~~freight as if discharge had been effected at the port or ports originally designated or to which the Vessel~~ 608
~~may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching~~ 609
~~and discharging the cargo at any such other port of discharge shall be paid by Charterers and Owners shall~~ 610
~~have a lien on the cargo for freight and all such expenses.~~ See clause \17                                                    611

**Both to Blame Collision** 48. If the liability for any collision in which the Vessel is involved while performing this Charter falls to 612
be determined in accordance with the laws of the United States of America, or the laws of any State which 613
applies laws similar to those applied in the USA in the circumstances envisaged by this Clause, the 614
following Clause shall apply:- 615

"If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and 616
any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or 617
in the management of the Vessel, the owners of the goods carried hereunder will indemnify the carrier 618
against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability 619
represents loss of, or damage to, or any claim whatsoever of the owners of, said goods, paid or payable by 620
the other or non-carrying vessel or her owners to the owners of said goods and set off, recouped or 621
recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying 622
vessel or carrier. 623

The foregoing provisions shall also apply where the owner, operators or those in charge of any vessel or 624
vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of 625
collision or contact." 626

Whilst Charterers shall procure that all Bills of Lading issued under this Charter shall contain a provision 627
in the foregoing terms, to be applicable where the liability for any collision in which the Vessel is involved 628
falls to be determined in accordance with the preamble of this Clause, Charterers neither warrant nor 629
undertake that such provision shall be effective. In the event that such provision proves ineffective 630
Charterers shall, notwithstanding anything to the contrary herein provided, not be obliged to indemnify 631
Owners. 632

**General Average** 49. General Average shall be adjusted and settled in London in accordance with the York/Antwerp 633

*17*

Rules 1974 as amended 1990 1991 or any modification or re-enactment thereof for the time being in force. 634

**New Jason**
50. If, notwithstanding Clause 49, it is agreed in writing that General Average adjustment be made in 635
accordance with the law and practice of the United States of America, the following Clause shall apply:- 636
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, 637
resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence 638
of which, the carrier is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or 639
owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, 640
losses or expenses of a general average nature that may be made or incurred and shall pay salvage and 641
special charges incurred in respect of the cargo. 642

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving 643
ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover 644
the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be 645
made by the cargo shippers, consignees or owners of the cargo to the carrier before delivery". 646

**. .IC
Certificate/
US
Coastguard
Regulations**
51. Owners undertake that the Vessel carries on board a valid US Coast Guard Certificate of Financial 647
Responsibility as required under the US Federal Water Pollution Control Act as amended by the Clean 648
Water Act of 1977. Any delay arising from failure by Owners to have such a Certificate on board the Vessel 649
shall not count as laytime or, if the Vessel is on demurrage, as demurrage. 650

Owners warrant that during the period of this Charter the Vessel shall comply with all applicable US Coast 651
Guard Regulations and that if in any respect whatsoever the Vessel does not so comply there shall be on 652
board the Vessel appropriate waivers from the US Coast Guard. Any delay arising from non-compliance 653
with the foregoing provision shall not count as laytime or, if the Vessel is on demurrage, as demurrage See also clause N. 654

**Clause
Paramount**
52. All Bills of Lading issued under this Charter shall contain the following Clause Paramount or a Clause Paramount 655
in similar terms, except where the Hamburg Rules apply compulsorily as per BPVOY 4, Clause 43 as attached.

"CLAUSE PARAMOUNT 656

~~This Bill of Lading shall:~~ 657

~~(1) in relation to the carriage of any goods from any port in Great Britain or Northern Ireland to any other~~ 658
~~port whether in or outside Great Britain or Northern Ireland have effect subject to the provisions of the~~ 659
~~Carriage of Goods by Sea Act 1971 and to the Rules contained in the Schedule thereto (the Hague/Visby~~ 660
~~Rules) and nothing herein contained shall be deemed a surrender by the Carrier of any of his rights or~~ 661
~~immunities or an increase of any of his responsibilities or liabilities under the said Act;~~ 662

~~(2) in relation to the carriage of any goods from any port in a state in which legislation similar in effect to~~ 663
~~the Carriage of Goods by Sea Act 1971 of the United Kingdom is in force to any port in any other state, have~~ 664
~~effect subject to such legislation and to the Rules contained in the Schedule thereto and nothing herein~~ 665
~~contained shall be deemed a surrender by the Carrier of any of his rights or immunities or an increase of~~ 666
~~any of his responsibilities or liabilities under the said legislation;~~ 667

~~(3) in relation to the carriage of any goods between ports in two different states, where this Bill of Lading~~ 668
~~is issued in Great Britain, Northern Ireland or any state in which legislation similar in effect to the~~ 669
~~Carriage of Goods by Sea Act 1971 of the United Kingdom is in force have effect subject to such Act or such~~ 670

*18*

legislation and to the Rules contained in the Schedule thereto and nothing herein contained shall be deemed 671
a surrender by the Carrier of any of his rights or immunities or an increase of any of his responsibilities or 672
liabilities under the said Act or said legislation;— 673

(4) in any other case have effect as if the contract of carriage herein contained were a contract of carriage 674
to which the provisions of the Carriage of Goods by Sea Act 1971 of the United Kingdom applied and the 675
Carrier shall be entitled to the benefit of the privileges, rights and immunities conferred by the said Act and 676
the Rules contained in the Schedule thereto as if the same were herein specifically set out. 677
Notwithstanding the foregoing provisions of this Clause the Hague/Visby Rules shall not apply to this 678
contract where the goods carried hereunder consist of cargo which by this contract is stated as being 679
carried on deck and is so carried. 680
If any term of this Bill of Lading be repugnant to the provisions of the Hague/Visby Rules such term shall 681
be void to that extent but no further." 682

TOVALOP    53  Owners warrant that the Vessel is a Participating Tanker in TOVALOP and will so remain during 683
this Charter, provided however that nothing herein shall prevent Owners, upon prior notice to Charterers, 684
from withdrawing from TOVALOP under Clauses III(B) or X thereof, and provided further that upon any 685
withdrawal under Clause III(B) or under Clause X, following an amendment to TOVALOP which does not 686
materially increase the obligations of the Parties thereunder, Charterers shall have the option to terminate 687
this Charter.— 688

When an escape or discharge of Oil occurs from the Vessel and causes or threatens to cause Pollution 689
Damage, or when there is the Threat of an escape or discharge of Oil (i.e. a grave and imminent danger of 690
the escape or discharge of Oil which, if it occurred would create a serious danger of Pollution Damage), 691
then Charterers may, at their option, upon notice to Owners or the Master, undertake such measures as are 692
reasonably necessary to prevent or minimise such Damage or to remove the Threat, unless Owners 693
promptly undertake the same. Charterers shall keep Owners advised of the nature and result of any such 694
measures taken by them, and, if time permits, the nature of the measures intended to be taken by them. Any 695
of the aforementioned measures taken by Charterers shall be deemed taken on Owners' authority and as 696
Owners' agent, and shall be at Owners' expense except to the extent that 697

(a) any such escape or discharge or Threat was caused or contributed to by Charterers; or 698

(b) by reason of the exceptions set out in Article III, paragraph 2, of the 1969 International Convention on 699
Civil Liability for Oil Pollution Damage, Owners are, or had the said Convention applied to such escape or 700
discharge or to the Threat, would have been, exempt from liability for the same; or 701

(c) the cost of such measures together with all other liabilities, costs and expenses of Owners arising out of 702
or in connection with such escape or discharge or Threat removal exceeds One Hundred and Sixty U.S. 703
Dollars per ton or Sixteen Million Eight Hundred Thousand U.S. Dollars, whichever is the lesser, save 704
insofar as Owners shall be entitled to recover such excess under either the 1971 International Convention 705
on the Establishment of an International Fund for Compensation for Oil Pollution Damage or under 706
CRISTAL, provided that in any incident to which the TOVALOP Supplement applies the Owners' limit of 707
liability hereunder shall be that provided for in the said Supplement;— 708
PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures should be 709
discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to continue 710
said measures under the provisions of this Clause and all further liability to Charterers under this Clause 711
shall thereupon cease.— 712
The above provisions are not in derogation of such other rights as Charterers or Owners may have under 713

~~this Charter or may otherwise have or acquire by Law or any International Convention or TOVALOP.~~     714
~~For the purposes of this Clause, the meaning of the terms "Oil" and "Pollution Damage" shall be as~~     715
~~defined in TOVALOP and "ton" shall be understood in relation to "tonnage" as defined therein.~~     716

"Owners undertake that the vessel is a tanker owned by a member of the International Tanker Owners Pollution Federation Limited and, will so remain throughout the charter period. Owners further undertake that vessel will carry a valid CLC certificate and that the vessel is entered into the following Protection and Indemnity Club (please state full style)

| | | |
|---|---|---|
| Questionnaire 88 version 2 (Q88 V. 2) | 54. During pre-fixture negotiations leading to agreement between Owners and Charterers to the terms | 717 |
| | and conditions of this Charter Owners have, either in consultation with their brokers or otherwise, | 718 |
| | provided Charterers with a completed ~~BP Shipping Questionnaire~~ Questionnaire 88 version 2 (Q88 V. 2) a copy of which | 719 |
| | shall be attached hereto     as Appendix 1. | 720 |
| | Owners warrant that the responses to the ~~BP Shipping Questionnaire~~ Questionnaire 88 version 2 (Q88 V. 2) provided | 721 |
| | by or on behalf of them are | |
| | correct. If any response as provided by or on behalf of Owners proves to be incorrect Charterers shall be | 722 |
| | entitled either:- | 723 |
| | (a) to cancel this Charter forthwith without prejudice to any other rights available to them under this | 724 |
| | Charter or otherwise under English Law; or | 725 |
| | (b) to recover, by deduction from freight, any losses, costs, damages or expenses incurred as a direct result | 726 |
| | of Owners' breach of warranty. | 727 |
| | In the event of any conflict arising between any provision(s) in the body of this Charter and any provision(s) | 728 |
| | in Appendix 1 the provision(s) contained in the body of this Charter shall prevail. | 729 |
| Law | 55. The construction, validity and performance of this Charter shall be governed by English Law. The | 730 |
| | High Court in London shall have exclusive jurisdiction over any dispute which may arise out of this | 731 |
| | Charter. | 732 |

*In Witness Whereof* the parties have caused this Charter to be executed as of the date first above written

for and on behalf of Owners                            **OWNERS**

for and on behalf of ~~BP SHIPPING LIMITED as agents for~~ Sun Energy Trading Ltd. as              **CHARTERERS**

1. Sun Energy Trading Ltd. terms dated December 2006 Clauses A1-A26 amended as attached to be incorporated in this Charter Party.

2. Additional Clauses 1-18 as attached to be incorporated in this Charter Party.



SUN ENERGY TRADING LTD. TERMS DATED DECEMBER 2006
CLAUSES A1 – A26 AMENDED AS BELOW AND ADDITIONAL
CLAUSES TO CHARTER PARTY MT "LEONID UTESOV"
DATED 25TH JANUARY 2007

### A1     ADDITIONAL OIL POLLUTION INSURANCE

Owners warrant and to provide evidence when requested by Charterers that they have and will maintain throughout the period of this Charter the standard oil pollution insurance cover (currently USD 1 billion) available from their P & I Club;

Owners guarantee that the vessel is and will remain insured with a P & I Club which will be a Member of the International Group of P & I Clubs.

### A2     CLEAN BALLAST CLAUSE

Vessel to arrive at each loading port with clean ballast, ~~free of slops~~ and tank washings unless otherwise agreed. Vessel is to be able to ballast/deballast simultaneously with loading/discharging.

### A3     CLOSED LOADING/DISCHARGING SYSTEM CLAUSE

Owners warrant vessel is and will remain equipped with fully operational Closed Loading System, which shall enable loading and discharging of the vessel with all tank openings closed and ventilation to atmosphere through vent stack or through high/constant velocity valves, according to SOLAS 1974 Regulation 59. Such system shall be used during entire loading and discharging operations.

### A4     EXXON DRUG & ALCOHOL POLICY BLANKET DECLARATION CLAUSE

Owners warrants that it has a policy on Drug and Alcohol Abuse ("Policy") applicable to the vessel which meets or exceeds the standards in the Oil Companies International Marine Forum guidelines for the Control of Drugs and Alcohol Onboard the Ship. Under the Policy, alcohol impairment shall be defined as blood alcohol content of 40 mg/100 ml or greater; the appropriate seafarers to be tested shall be all vessel officers and the drug/alcohol testing and screening program ("Program") shall include unannounced testing in addition to routine medical examinations. An objective of the Policy should be that the frequency of the random and unannounced testing be adequate to act as an effective abuse deterrent, and that all officers be tested at least once a year through a combined programme of unannounced testing and routine medical examinations.

Owner further warrants that the Policy will remain in effect during the term of this Charter and that Owner shall exercise due diligence to ensure that Policy is complied with. It is understood that an actual impairment or any test finding of impairment shall not and of itself mean the Owner has failed due diligence.

## A5     ELIGIBILITY

~~Owners warrant that the Vessel is and will remain at all times and throughout the currency of the Charter Party eligible and fully able in all respects to trade without let or hindrance, to all ports and places specified in the Charter Party. Furthermore Owners warrant that at all times there shall be on board all certificates, records and other documents and equipment required to perform the agreed service.~~

Owners warrant that the vessel is in all respects but always within her description/specification provided in main terms and Q88, eligible and not prevented for any reason whatsoever for trading to the ports and places specified in clauses C and D hereof and that at all necessary time, she shall have onboard all certificates, records and other documents required for such services by international regulations, but excluding local/specific requirements, unless same agreed prior to fixing of Charter Party. If any of eligibilities under this clause is breached, any delay resulting there from shall not count as laytime or if the vessel is on demurrage, as time on demurrage.

## A6     PRIVATE AND CONFIDENTIAL CLAUSE

The terms and conditions of this Charter Party and its negotiations to be kept strictly private and confidential and shall not be reported.

## A7     ITF CLAUSE

Owners guarantee that the minimum terms and conditions of employment of the crews of the vessel are now or will be prior to presentation for loading and will remain for the duration of this Agreement covered by an ITF Agreement or a bona fide Trade Union Agreement acceptable to ITF. Any time lost/expenses incurred due to non-compliance of above to be for Owners' account.

## A8     ADDITIONAL CLEANING CLAUSE

If the vessel fails two first inspections (including 1st foot sample) carried out by Charterers'/Shippers' Surveyors, Charterers have the right to cancel the Charter Party, such cancellation to be effected within 24 hours of final inspection.

## A9    CREW CLAUSE

Owners warrant that all officers shall be proficient in the English language and experienced and qualified to handle the cargoes referred to in Clause 3.

## A10    ISM CODE CLAUSE

Owners guarantee that this vessel complies fully with the ISM Code and is in possession of a valid Safety Management Certificate and will remain so for the entirety of her employment under this Charter Party. The Owners to provide Charterers with satisfactory evidence of compliance if required to do so and to remain fully responsible for any and all consequences arising directly or indirectly from any matters arising in connection with this vessel and the ISM Code.

## A11    RECEIVING/DEBALLASTING

Owners warrant that the vessel is capable of accepting cargo at the following minimum acceptance rates and of deballasting with the following maximum periods;

| Minimum Maximum Ship's size | Cargo acceptance rate | Deballasting period |
|---|---|---|
| Up to 81.283 mt sdwt | 7, 5 % of sdwt/hour | 5 hours 30 minutes |
| 81.284 - 162.567 mt sdwt | 6, 6 % of sdwt/hour | 8 hours 40 minutes |
| 162.568 - 325.134 mt sdwt | 5, 8 % of sdwt/hour | 11 hours 10 minutes |
| Over 325.135 mt sdwt | 5, 8 % of sdwt/hour | 3 hours 00 minutes |

Should the Vessel's cargo acceptance rate be less than the relevant minimum rate specified above or should the deballasting time specified above exceed the relevant maximum period the excess time required to complete loading shall be deducted from any laytime or demurrage accruing under the provisions of this charter.

Owners warrant that the Vessel shall present manifolds of 16 inch diameter, class ANSI 150 with a minimum 500 mm between flanges or reducer/spool pieces such that the quick closing coupler may operate without restrictions.

## A12    CLAIMS

Charterers shall be discharged and released from liability in respect of any claims Owners may have under this Charter Party (such as, but not limited to, claims for dead freight, demurrage, shifting and port expenses only) unless a claim has been presented in writing to Charterers with supporting documents within ninety (90) days from completion of discharge of the cargo under this Charter Party.

## A13    UNITED KINGDOM ROUTEING CLAUSE

Owners warrant that the vessel will comply with the 'Interim Voluntary Code: routing in the United Kingdom waters for ships carrying oil or other hazardous substances in bulk' published by the British Chamber of Shipping, March 1993.

## A14    BALTIC WATERS CLAUSE

Owners warrant that during the term of this Charter Party if the voyage involves a passage in or out of the Baltic Sea, Vessel will comply with all regulations and recommendations in force related to trafficking in the Baltic, including traffic routing and vessel movement reporting. Oil, oily residues and waste to be retained onboard while the vessel is in the Baltic Sea.

## A15    U.S. OPA -90 CLAUSE

Owners warrant that the vessel will comply with all applicable OPA/CERCLA requirements including the obtaining of a COFR and the deposit with the US Coast Gard of a letter confirming that they have in place a service contract with NRC who are capable of responding to a worst case oil spill as defined under OPA 90.

N.B. The Organizations having such capability as determined by the USCG are 'Marine Spill Response Corp' (NRC) or 'National Response Corp' (NRC). The blank in the above clause should contain either one of these organizations advised by the Ship Owners.

## A16    ADDITIONAL LOAD/DISCHARGE PORT CLAUSE FOR LUMPSUM CHARTERS

~~Lump sum freight to be basis first load port to final discharge port.~~
~~Charterers shall be entitled to send the vessel to additional ports in which case they shall pay for the expenses at cost and for any additional steaming time at the demurrage rate plus the cost of bunkers consumed during the additional steaming time.~~
~~This to be paid together with freight against Owners' telexed invoice with full supporting documents to follow as soon as available. Time at all ports to count as per Charter Party.~~

Lump sum freight to be basis 1:1 one load port, one discharge port, including, if applicable, canal costs, OPA, AMPD/COFR charges.
Charterers shall be entitled to send the vessel to maximum 2 additional ports in which case all deviation time used to be calculated and paid for at demurrage rate per day pro rata, and all additional costs, including but not limited to bunkers consumed deviating, loading/discharging, port/agency, canal, OPA/AMPD/COFR cots to be for Charterers' account. Deviation to be calculated as that which exceeds direct passage from first load port to final discharge port. All such costs to be paid together with freight against Owners e-mailed/faxed/telexed invoice, hard copies to follow. If such extra port costs used, and Charterers' require co-mingling of any cargo, then Charterers to issue a Letter of Indemnity in Owners' P+I Club wording for same.

*MT "Leonid Utesov" -- Charter Party dated 25th January 2007 – page No. 4*

## A17     WAR RISKS INSURANCE

~~Owners shall effect war risk insurance in respect of the Hull and Machinery of the vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and indemnity risks), and the general premiums and/or calls therefore shall be for their account.~~

~~WAR RISKS INSURANCE ADDITIONAL PREMIUMS,~~

~~Incurred as a result of the Vessel entering an excluded area ('additional premium') shall be for Charterer's account, net of all discounts or rebates and provided always that Charterers are given notice of the amount of such additional premium as soon as possible and, in any event, before such additional premium is paid.~~

~~The benefit of discounts or rebates on additional premium received by Owners from their war risk insurers, underwriters or brokers shall be credited to Charterers in full. Charterers shall reimburse Owners any amounts due under this clause upon receipt of Owners' invoice together with full supporting documentation including all associated debit and credit notes.~~

~~For the avoidance of doubt any 'Blocking and Trapping', 'Loss of Profit', 'Loss of Hire', 'Loss of Freight' or 'Loss of Bunkers' insurance taken out by Owners in respect of the vessel, and any additional premium relating thereto arising for Charterers' trading of the vessel, shall be for Owners account. Crew war bonus, if any, to be for Owners' account.~~

Without prejudice to the other provisions of this charter with respect to war risks, any additional premium(s) payable by the Owner under the vessel's war risk insurance cover (whether such additional premium is payable in respect of an area designated as an additional premium area before or after the date of this charter), by virtue of the vessel

  (I)     proceeding to, entering, remaining at, and/or departing from any and all load ports under this charter and/or

  (II)    proceeding to, entering, remaining at and/or departing from any and all discharge ports under this charter and/or any crew bonus which the Owner agrees to pay in consequence of the matters specified in (I) and

  (III)   above, shall be for Charterers' account who are to pay to the Owners the amount due against presentation of underwriters/brokers invoices (in respect of premium) and against Owners' invoices (in respect of crew bonus).

## A18     ADDRESS COMMISSION CLAUSE

Commission: 5% total address discount on freight/deadfreight/demurrage deductable.

## A19     CHARTER PARTY ADMINISTRATION CLAUSE

~~Charter Party terms and conditions are evidence by the fixing confirmation sent by the broker. Owner and Charterer shall each confirm their approval of the fixing confirmation by return to the broker after lifting subjects. The broker shall then confirm receipt of said confirmation to both parties. Except as requested in writing by either Owners or Charterer, there shall be no formal written and signed Charter Party.~~

## BP AMENDED ADMINISTRATION CLAUSE

Charter Party terms and conditions are evidenced by the fixing confirmation e-mail sent (or issued) by the broker. Owners and Charterers shall each confirm their approval of the confirmation e-mail by return e-mail to the broker within one business day after lifting subjects. The broker shall then confirm receipt of said confirmation to both parties. Except as requested in writing by either Owner or Charterer, there shall be no formal written and signed Charter Party

## A20     CHEVRONTEXACO US CUSTOMS AUTOMATED MANIFEST SYSTEM (AMS) CLAUSE     (4-1-04)

~~(a)    If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Owner shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:~~

~~i)    Have in place a SCAC (Standard Carrier Alpha Code);~~
~~ii)    Have in place an ICB (International Carrier Bond); and~~
~~iii)    Submit a cargo declaration by AMS (Automated Manifest System) to the          US Customs.~~

~~(b)    The Charterer shall provide all necessary information to the Owner and/or their agents to enable the Owner to submit a timely and accurate cargo declaration.~~

~~The Charterer shall assume liability for and shall indemnify, defend and hold harmless the Owner against any loss and/or damage whatsoever (excluding consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterer's failure to comply with any of the provisions of this sub-clause. Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, all time used or lost shall count as laytime or, if the Vessel is already on demurrage, time on demurrage.~~

~~(c)    The Owner shall assume liability for and shall indemnify, defend and hold harmless the Charterer against any loss and/or damage whatsoever (excluding consequential loss and/or damage) and any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Owner's failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter~~

Party to the contrary, all time used or lost shall not count as laytime or, if the Vessel is already on demurrage, time on demurrage.

(d) The assumption of the role of carrier by the Owner pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

## A21    BIMCO ISPS CLAUSE

ISPS/MTSA CLAUSE FOR VOYAGE CHARTER PARTIES 2005

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA.

(ii) Loss, damages or expense (excluding consequential loss, damages or expense) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party, and any delay caused by such failure shall count as laytime or time on demurrage.

(c) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code/MTSA, the following shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code/MTSA.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code/MTSA shall count as laytime or time on demurrage, unless such measures result

~~solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers.~~

~~(d) Notwithstanding anything to the contrary provided in this Charter Party, any costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.~~

~~(e) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.~~

~~Footnote: This Clause replaces previously published ISPS Clause for Voyage Charter Parties AND the US Security Clause for Voyage Charter Parties, both of which are now officially withdrawn.~~

### A22    PRIMORSK BALLAST CLAUSE – Deleted not applicable

~~Owners/Master are aware that according to Primorsk port regulations the ballast water in ballast tanks should contain oil products not more than 0.05 mg/dm3. in case of heightened content of oil product found in ballast tanks the discharge of such water will be prohibited by port authorities. In view of the above the master should take ballast water at the considerable sea depth providing clean water at ballast tanks according to Primorsk regulations. Any time lost a/o any costs due to vessel's failure to comply with above, to be for Owners account and time not to count as laytime or as demurrage, if on demurrage.~~

### A23    BACKLOAD/RELOAD CLAUSE (NEW) – Applicable for CPP only

Charterers to have the option to backload/reload a quantity of cargo during discharge operations for blending/other purposes. Any cost involved including shifting between berths to be for Charterers' account and any time used to count as used laytime or demurrage, if on demurrage. Charterers to issue Letter of Indemnity as per Owners P&I Club wording without bank guarantee, which to become null and void 13 months after completion of discharge provided within such 13 months no legal proceedings have been instituted against Owners.

### A24    BUNKER CLAUSE (NEW - Deleted

~~If the vessel requires supply of bunkers for the voyage performed under this charter party the first and last option for supplying such bunkers to be given by Owners to Charterers or to their nominated company. Quality and cost always to be acceptable to Owners.~~

### A25    INTERIM LOAD/DISCHARGE CLAUSE – Applicable for CPP only – deleted,

~~If 2 load and/or 2 discharge ports used then freight calculation to be based from furthest load port to final discharge port/s as per Worldscale or as per lump sum freight if applicable, the other interim load/discharge port to be paid as a lump sum together with basic freight and calculated at cost, i.e. deviation time, bunkers consumed for same, all port costs (to be settled directly by Charterers), not limited but including agencies, brokerage. Deviation time to be calculated at demurrage rate, time in port against laytime,- however no notice time to apply. The other load/discharge port can be en route s North or North South. All costs as detailed herein to be paid together with freight against Owners faxed/e-mailed invoice, with hard copies to follow).~~

INTERIM LOAD/DISCHARGE PORT CLAUSE (MODIFIED):

Charterers to pay for additional interim load/discharge port at cost with additional steaming time used to be incurred for such deviation which exceeds direct passage from first load port to final discharge port.

Time to count from arrival pilot station at interim load/discharge port until dropping last outward pilot load discharge port, i.e. no allowance for notice time, nor deduction for shifting even from anchorage to 1st berth and no deductions for time lost due to weather and/or sea conditions. Deviation and time used to be calculated at demurrage rate per day pro rata plus costs for additional bunkers consumed as per Master's invoice presented by Owners. Deviation, time used, bunkers consumed and port costs as per agents proforma D/A to be paid together with freight as per Owner's telexed invoice, which later to be supported by hard copy documentation.


### A26    TRIESTE CLAUSE (NEW) – Deleted, not applicable

~~Owners warrant that the vessel complies with all present rules/regulations required at the port of Trieste.~~



ALEXIA
SHIPPING LIMITED

## ADDITIONAL CLAUSES

### 1. VESSEL'S DESCRPTION

MT "LEONID UTESOV"
Double bottom
Russian flag
Built 1989
SDWT 16,970 MT on 9.36 m S. draft
LOA 151.5 M
BEAM 22.40
Cargo Capacity at 98% excluding slops 20,070.89
Sigma Phenguard coated
KTM 40.50 M
P & I Club West of England

Last 3 cargoes: ULSD/VEGS/PALMS

### 2. OWNERS' FREIGHT PAYMENT DETAILS

Please pay in USD by telegraphic transfer to:

In favour: Novoship
Bank of Foreign Trade, Moscow – SWIFT: VTBRRUMM
Account 890-0055-006 with Bank of New York, New York – SWIFT: IRVTUS3N
Further credit: Krasnodar Branch – SWIFT: VTBRRUM2KDR
In favour: Novoship
Account: 40702840714051000227
And advise Novoship, Novorossiysk
Tlx: 279170 / 279153
Fax: +7 8617 601 993
With ref: MT Leonid Utesov / Sun Energy Trading CP dated 25-1-2007.

**3.** Vessel not to tender Notice of Readiness prior to commencement of laycan unless with Charterers' written prior consent.

**4.** If ship to ship loading all port charges including agency fees to be for Charterers' account and paid directly by them

## 5. IGS CLAUSE - Not applicable

~~Any de-inerting/re-inerting at Charterers'/suppliers' request, time and cost to be for Charterers' account.~~

## 6. TAX CLAUSE

Any taxes and/or dues on cargo or freight to be for Charterers' account and to be directly settled by them.

<u>7.</u> Maximum 3 hours time awaiting cargo documents for Owner's account, thereafter all time to be for Charterers' account.

## 8. BALTIC NAVIGATION CLAUSE

Before entering Baltic waters vessel to have all navigational aids in perfect working order and while in the Baltic and/or Gulf of Finland strictly observe all regulations and recommendations. No oil, or oily residues or waste to be let over board into the sea while in the Baltic Sea or in the Gulf of Finland.

## 9. BIMCO ISPS/MTSA CLAUSE to apply ( revised BIMCO ISPS CLAUSE deleted).

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).
(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA.

(ii) Loss, damages or expense (excluding consequential loss, damages or expense) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except

as otherwise provided in this Charter Party, and any delay caused by such failure shall count as laytime or time on demurrage.

(c) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code/MTSA, the following shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code/MTSA.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code/MTSA shall count as laytime or time on demurrage, unless such measures result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers.

(d) Notwithstanding anything to the contrary provided in this Charter Party, any costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(e) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.


10.   **BIMCO AMS CLAUSE** to apply (CHEVTEX AMS CLAUSE deleted)

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Owners shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i) Have in place a SCAC (Standard Carrier Alpha Code);
ii) Have in place an ICB (International Carrier Bond); and
iii) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs.

(b)The Charterers shall provide all necessary information to the Owners and/or their agents to enable the Owners to submit a timely and accurate cargo declaration.
The Charterers shall assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of this sub-clause. Should such failure result in any delay then, notwithstanding any provision in this Charter Party to

the contrary, all time used or lost shall count as laytime or, if the Vessel is already on demurrage, time on demurrage.

(c)The Owners shall assume liability for and shall indemnify, defend and hold harmless the Charterers against any loss and/or damage whatsoever (including consequential loss and/or damage) and any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Owners' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, all time used or lost shall not count as laytime or, if the Vessel is already on demurrage, time on demurrage.

(d) The assumption of the role of carrier by the Owners pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.


## 11.  INTERNAL STRIPPING CLAUSE

Time used for internal stripping of cargo tanks after bulk discharge bu maximum 2 hours to count as laytime or demurrage if vessel is on demurrage.


## 12.   T.V.E.L CLAUSE – Applicable for N/B ONLY – Not applicable

~~In the event that the vessel requires a TVEL inspection prior to the commencement of cargo operation at any United States of America or its controlled territories port, notice of readiness may be tendered only when vessel has been granted TVEL.~~
~~Should the vessel fail to pass the inspection, the notice of readiness cannot be tendered until the vessel has passed the examination and a TVEL is issued. All time lost shall not count as used laytime, or demurrage, if the vessel is on demurrage.~~
~~Furthermore, any additional costs incurred due to such failure shall be for the account of the vessel's Owner. These costs shall include, but not limited to, tugs / pilots and other port costs.~~


## 13.  USCG ANNUAL TVEL/RANDOM BOARDING – Not applicable

~~In the event vessel is subject for USCG periodical TVEL/COC on arrival at load/discharge port, then all time in excess of 24 hours consumed for awaiting a USCG inspection to count against laytime or demurrage, if vessel is on demurrage. Such time to count from vessel's arrival at port designated anchorage/waiting area or other nominated by port authorities until USCG inspection arrives on board.~~
~~USCG inspection time not to count against laytime.~~
~~Any delays resulting from random boarding/inspection in respect of PSC safety and environmental protection compliance targeting matrix shall count as laytime or time on demurrage.~~
~~Should the vessel delays beyond the agreed laycan solely by reason of waiting for above said boarding/inspections, then Charterers' option to cancel the charter party cannot be exercised.~~

## 14. BUNKER FUEL SULPHUR CONTENT CLAUSE

Owners confirm they are aware of the maximum sulphur content requirements of any sulphur emission control area ("SECA") the vessel may be required to enter during the performance of this charter. Owners shall, without loss of time and/or deviation, use fuels of such specifications and grades to ensure compliance with these requirements. For the purpose of this clause, "SECA" shall mean areas as stipulated in Marpol Annex VI and/or zones and/or areas regulated by regional and/or national authorities such as, but not limited to, the EU and the US environmental protection agency. Owners shall indemnify, defend and hold Charterers harmless in respect of any direct or indirect loss, liability, delay, fines, costs or expenses arising or resulting from Owners' failure to comply with this clause.

## 15. SAMPLING CLAUSE

If required by Charterers, but always in compliance with tanker safety regulations, vessel to open cargo tank hatches enabling Charterers representative to perform cargo sampling. Any additional time/expenses for de-inerting / re-inerting to be for Charterers' account.

## 16. TURKISH STRAITS CLAUSE – Not applicable

~~Notwithstanding anything else to the contrary elsewhere herein contained if the vessel commences the ballast voyage (as per itinerary advised above) in time to arrive at the load port within the canceling date but is delayed because of the traffic regulations or navigational difficulties (including bad weather, fog etc.) through the Turkish Straits North-bound such that vessel may not arrive by the canceling date Charterers' option to cancel as provided elsewhere herein cannot bee exercised. Owners to notify Charterers of the date and time that they expect the vessel to be ready to load on the advisory position given by the traffic control. Notwithstanding anything to the contrary elsewhere herein contained, if the vessel should be delayed during tanker passage or otherwise as a consequence of direct or indirect action of the Turkish authorities and/or observing traffic regulations and/or navigational difficulties (incl. bad weather and/or adverse climate conditions) through the Turkish Straits North-bound and South-bound in excess of 48 hours in total, the Charterers shall pay compensation for such delay at the rate provided for demurrage. Any additional expenses in connection with complying with traffic regulation and/or Charterers' voyage orders as regards the passage of the Turkish Straits to be for Charterers' account (including but not limited to additional tugs, pilots, additional bunkers consumed — waiting or adrift etc.) compensation for such delay, reimbursement for cost of bunkers and additional expenses to be paid together with freight against Master's statement with supporting documents to follow in due course. Owners shall nominate agents for the Turkish Straits passage.~~

## 17.  OWNERS WEATHER CLAUSE

If Fiumicino/Civitavecchia/Falconara/Ancona/Ravenna/La Nouvelle/Gaeta/St. Panaghia Bay/
Gela/Morocco or Spain Atlantic including Canary/Portugal or SPM/Sea line/Offshore installations
time to count in full weather permitting or not.
Any unberthing/reberthing, time and expenses due to bad weather or swell/sea conditions at
load/discharge ports. To be for Charterers' account and settled directly by them.

If Charterers require a ship-to-ship transfer operation or lightening by lightering barges to be
performed, then Charterers to supply all additional equipment for ship-to-ship operation at their own
time and expense. Ship-to-ship operation to be conducted according to the latest edition of
ICS/OCIMF 'Ship-to-Ship Transfer Guide (Petroleum)' and is subject to the Master's final
confirmation which should not be unreasonably withheld. All time to count weather permitting or
not.

## 18.  ITALY ENTRANCE REPORTING CLAUSE – not applicable

~~Charterers to advice Owners at least 84 hours in advance of their intention to load and/or discharge
in any Italian port(s).~~
~~Failure to do so and/or where absence of. And/or a change of Charterers orders result in the vessel
being unable to comply with the time-frame for submitting the requirements to 'compamare', then
any resultant and/or subsequent waiting time and/or any costs incurred by Owners for entry into
Italian port(s) to be for Charterers' account and to be settled together with freight against Owner's
invoice sent via telex or e-mail or fax, with hard copies to follow.~~





## BPVOY4 VOYAGE CHARTER PARTY

**Clause 43     CLAUSE PARAMOUNT**

All Bills of Lading issued under this Charter shall be deemed to contain the following Clause Paramount:-

"CLAUSE PARAMOUNT

(1)     This Bill of Lading shall have effect subject to any national law making the International Convention for the unification of certain rules of law relating to Bills of Lading signed at Brussels on 25th August 1924 (The Hague Rules) or the Hague Rules as amended by the protocol signed at Brussels on 23rd February 1968 (The Hague/Visby Rules) compulsorily applicable to this Bill of Lading. If any term of this Bill of Lading be repugnant to that legislation to any extent, such term shall be void to that extent but no further. Neither the Hague Rules nor the Hague/Visby Rules shall apply to this Bill of Lading where the goods carried hereunder consist of live animals or cargo which by this Bill of Lading is stated as being carried on deck and is so carried.

(2)     Save where the Hague or Hague/Visby Rules apply by reason of (1) above, this Bill of Lading shall take effect subject to any national law in force at the port of shipment or place of issue of the Bill of Lading making the United Nations Convention on the Carriage of Goods by Sea 1978 (the Hamburg Rules) compulsorily applicable to this Bill of Lading in which case this Bill of Lading shall have effect subject to the Hamburg Rules which shall nullify any stipulation derogating therefrom to the detriment of the shipper or consignee.

(3)     Where the Hauge, Hauge/Visby or Hamburg Rules are not compulsorily applicable to this Bill of Lading, the carrier shall be entitled to the benefits of all privileges, rights and immunities contained in Articles I to VIII of the Hague/Visby Rules.

(4)     Nothing in this Bill of Lading shall be construed as in any way restricting, excluding or waiving the right of any relevant party or person to limit his liability under any available legislation and/or law".





 **NOVOROSSIYSK SHIPPING COMPANY**

1, UL. SVOBODY
NOVOROSSIYSK 353900
RUSSIA
WED-SITE: www.novoship.ru
E-MAIL : pruss@novoship.ru
FAX: +7 8617 601 060 \ 601 993

OUR REF.: 03.02 /PAI / 712

NOVOROSSIYSK ,
19.07.2007

## DEMURRAGE   INVOICE

MT    LEONID UTESOV
C\P    25.01.2007
A/C    SUN ENERGY TRADING LTD.
C\O    NAVITANK , SWEDEN
VOY: TALLINN – CAMPBELTOWN  31.01 – 19.02.2007

| | |
|---|---|
| TIME ON DEMURRAGE | 130 HRS 34 MIN |
| AT DEMURRAGE RATE PER DAY | U.S. DOLLARS   14,500.00 |
| DEMURRAGE ( GROSS) TO BE | U.S. DOLLARS   78,884.03 |
| LESS: 5 PCT ADD DISCOUNT | U.S. DOLARS    3,944.20 |
| NET DEMURRAGE TO NOVOSHIP | U.S. DOLLARS  74,939.83 |

PLEASE REMIT ABOVE SUM TO OUR ACCOUNT AS BELOW :

BANK FOR FOREIGN TRADE ,MOSCOW –SWIFT  VTBRRUMM
ACCOUNT  890-0055-006
WITH BANK OF NEW YORK,NEW YORK – SWIFT IRVTUS3N
FURTHER CREDIT : KRASNODAR BRANCH – SWIFT :VTBRRUM2KDR
IN FAVOUR : NOVOSHIP
ACCOUNT   40702840714051000227

WITH REF.: MT L. UTESOV C/P 25.01.07 \ SUN ENERGY TRADING  DEMURRAGE

*NOVOSHIP  OPERATIONS DEPT*
*ANTONINA PRUSS*

СИСТЕМА УПРАВЛЕНИЯ
БЕЗОПАСНОСТЬЮ
сертифицирована РС

SAFETY MANAGEMENT
SYSTEM
certified by RS

**EXHIBIT**
B